430 So.2d 1273 (1983)
STATE of Louisiana
v.
Troy G. BEASLEY.
STATE of Louisiana
v.
Jeffery M. ROMERO.
Nos. 82 KA 0838, 82 KA 0839.
Court of Appeal of Louisiana, First Circuit.
April 5, 1983.
*1274 Stephen E. Caillouet, Asst. Dist. Atty., Thibodaux, for plaintiff.
F. Smith Knobloch, Asst. Indigent Defender, Thibodaux, for defendants Troy G. Beasley and Jeffery M. Romero.
*1275 Before LOTTINGER, COLE and CARTER, JJ.
CARTER, Judge.
Defendants, Troy G. Beasley and Jeffery M. Romero, were each originally charged with possession of cocaine in violation of La.R.S. 40:967 and with possession of marijuana in violation of La.R.S. 40:966. Defendants initially entered pleas of not guilty and filed motions to suppress. The charge of possession of cocaine against Romero was subsequently dropped and Romero changed his plea to guilty of possession of marijuana. Defendant Beasley withdrew his plea of not guilty to possession of cocaine and entered a plea of guilty to this charge.[1] Both of the defendants reserved their rights under pending motions to suppress and to appeal. After a consolidated hearing on the motions to suppress, the trial court denied the motions and ordered a pre-sentence investigation.
Romero was subsequently sentenced to serve six months in the parish jail and ordered to pay a fine of $500.00. Beasley was sentenced to serve five years with the Louisiana Department of Corrections and ordered to pay a fine of $5,000.00; provided, however, that upon Beasley's paying the fine and court costs, the five year sentence with the Department of Corrections was suspended and the defendant placed on active supervised probation for a period of five years with a special condition that he serve one year in the parish prison and report to a drug abuse center for evaluation and treatment if necessary.
Each defendant appeals the trial court's denial of the motion to suppress, and Beasley also appeals contending that his sentence was excessive. These cases were consolidated by this Court, ex proprio motu.
On January 1, 1982, at about 2:40 in the afternoon, Troopers Hyatt and Smith of the Louisiana State Police were on routine patrol on U.S. Highway 90 when they observed a brown Camaro backed into a driveway leading into a farmer's pasture. One officer testified that the vehicle was approximately 30 or 40 feet from the travelled portion of the roadway in a "kind of like obscured area." The location on U.S. Highway 90 was just west of the Queen Bee Lounge off the westbound lane. After observing the parked vehicle, the police officers turned their vehicle around and proceeded back pulling their patrol vehicle into the driveway so as to be headlight-to-headlight with the parked vehicle. Trooper Louis Hyatt testified as follows:
"Q. Can you explain to the Court what were the circumstances in which you encountered him or them on that day?
A. Yes, sir. We were driving down, I was with Trooper Smith I was a training officer at that time. We were patrolling east on U.S. 1-90, correction U.S. 90, and off to our left we observed a brown Camero backed up into a farmer's pasture. The car was backed up in there and it's kind of like obscured area and we passed by and could see some people in the car and felt that it would be a wise thing to check and see why they were parked in that area. So we turned around and came back and pulled our patrol in to the driveway so we'd have been headlight-to-headlight. Parked in with them. And when we did we observed the passenger in the front, everyone in the car looked like they got real excited, because, on the sight of the police. The passenger started ducking down looking like he was trying to stuff something under the seats and stuff. Then he jumps out of the car and he starts screaming `I can't believe this. I *1276 can't believe this.' and you know he was darting all over the place and he was real frantic.
Q. Do you who, which passenger was that?
A. That would have been Mr. Romero, I belive. Yeah, Mr. Jeffrey Romero.
Q. Prior to that time did you order him out of the car or anything?
A. No, sir. I just, I was trying to get out of my car myself when all this, you know, took place.
Q. Did you get out of your car first or did Mr. Romero get out of his car first?
A. We both exited about the same time.
Q. OK, and what did you do after that?
A. Well, sir, I tried to contain him first `cause I don't know what's this fella going to do, you know. So I tried to contain him and hold on to him and see what he was going to do `cause I don't know if the guy's got anything in his pockets or anything like this. I'm trying to, you know, calm him down and contain him and see why he's reacting this way to me. So we tried to contain him first."
After restraining Romero, Beasley stepped out of the vehicle and was frisked, and Officer Hyatt walked over and looked inside the car. He observed a lady in the backseat holding a baby. On the front seat passenger side of the vehicle, he observed orange syringe cap covers, clear plastic triangular bags that contained a white crystalline type powder, and a three to four inch long plastic stick that had a white residue powder on the tip end of it. He also observed a couple of roach clips hanging inside the car. The officers immediately advised Beasley, Romero, and the female passenger of their Constitutional rights and called for a narcotics officer to come to the scene. Upon the arrival of the narcotics officer, the officers again advised Beasley and Romero of their rights and obtained a signed written advice of rights form. In addition, Beasley signed a written consent to search his vehicle. Trooper Hyatt handed the narcotics officer the clear plastic triangular bags that contained a white crystalline powder and a handrolled marijuana cigarette. A search of the vehicle revealed a clear plastic bag of marijuana, and several small clear plastic packages containing cocaine, together with smoking paraphernalia. A search of the trunk revealed a large bag containing sixteen smaller clear plastic bags of marijuana.

ASSIGNMENT OF ERROR NO. 1
In the defendants' first assignment of error, they allege that the trial judge erred in denying their motion to suppress the contraband. Defendants argue that the contraband was seized as a result of an unlawful search because the officers lacked probable cause to even approach the vehicle. Defendants assert that the law officers obviously violated La.C.Cr.P. art. 215.1[2], in that they were stopped in a public place by officers who did not reasonably believe that they were committing, had committed, or were about to commit an offense.
*1277 Defendants' reliance upon La.C. Cr.P. art. 215.1 is misplaced. We agree that the officers initially had no knowledge that a crime was being committed, had been committed, or was about to be committed. Officer Hyatt testified that he "felt like it would be a wise thing to check and see why they were parked in that area." The record does not reflect that the officers had any idea that there was criminal activity afoot. However, La.C.Cr.P. art. 215.1 is not applicable because we find that the encounter initiated by the officers was lawful. Police must have probable cause to arrest an individual and reasonable cause to detain an individual in a public place.[3] However, the fact that the police approach a citizen and address him does not compel that citizen to respond, and nothing prevents that citizen from choosing not to answer or from walking away. State v. Green, 390 So.2d 1253 (La.1980); State v. Shy, 373 So.2d 145 (La. 1979). Further, the fact that a police vehicle pulls up beside, to the rear of, or headlight-to-headlight with a vehicle does not necessarily constitute restraint, nor does it necessarily stop the individual from going about that individual's lawful activities.
The trial judge, in reference to the above, aptly stated:
Record, Pp. 42, 43
"Mr. Knobloch I would have to agree with you if I didn't live out in the country. I have a driveway that goes into a pasture and if I knew that State Police came by there and saw a car parked in my driveway under suspicious circumstances and didn't stop I would try to get him in trouble. I think that the State Police have a right, in fact have a duty, to investigate suspicious circumstances on and off the highway. If this man had been along the highway and not been violating any law there would have been no reason to pull him off, but I have to also call your attention that if these people had been in trouble, with a breakdown or a flat tire they would have been glad to see the police stop to assist them. And I know that it's common occurrance for the State Police, the Deputies and everybody in law enforcement to loan assistance to motorists who're having trouble on the highway. The Court will rule that the State Troopers not only had a right, but they had an obligation to be where they were when the defendant became upset with the appearance of the trooper."
Therefore, even though the officers in the instant case had no knowledge or suspicion that the defendants were engaged in criminal activity, they did not need "probable cause to arrest" or "reasonable cause to detain" in order to approach the defendant's car. Clearly, the police were justified in wanting to get a closer look at the situation for any number of reasons. The defendants might have been trespassers (it appears that they were), or stranded and in need of help. Certainly, police have the right to engage anyone in conversation without reasonable grounds to believe that they have committed a crime. State v. Duplessis, 391 So.2d 1116 (La.1980); State v. Neyrey, 383 So.2d 1222 (La.1979); State v. Shy, supra. In the instant case, the police did not have time to engage the defendants in conversation before the defendants' activity and behavior became such as to arouse reasonable suspicion giving the policemen more than sufficient reasonable cause to continue the investigation. The "investigatory stop" in this case did not occur when the officers pulled their vehicle headlight-to-headlight with the vehicle occupied by the defendants. The vehicle occupied by the defendants had already stopped. If each defendant had calmly stepped out of the vehicle, or had done nothing, the matter would have ended. The police officers never had a chance to converse with the occupants of the vehicle because immediately upon the officers' arrival, *1278 defendant Romero jumped out of the car performing frantic motions and screaming "I can't believe this, I can't believe this." This behavior and the frantic activity of the other occupants of the vehicle ripened an otherwise innocuous situation to one which aroused "reasonable suspicion to detain and question."
The "investigatory stop" in this case occurred after activity on the part of the defendants was sufficient to provide reasonable grounds to suspect each of these defendants of being involved in past, present or imminent criminal activity. State v. Bickham, 404 So.2d 929 (La.1981). As the officers were proceeding with detainment of the individuals under reasonably suspicious circumstances, they observed contraband in plain view on the seat of the vehicle. Therefore, reasonable suspicion to detain ripened into probable cause to arrest. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).[4] It was only after the contraband was discovered in the vehicle that the defendants were placed under arrest.
The "arrest" and "seizure" portion of the instant case are very similar to that in the case of State v. Commodore, 418 So.2d 1330 (La.1982). In that case, the Court found that based on information furnished by an informant, police officers had reasonable cause to conduct an investigatory stop of a moving vehicle. When an officer approached the vehicle to ask the driver to step out, he observed several aluminum foil packets on the rear seat and floor board of the vehicle and recognized the packets as common containers of contraband drugs. The Court found that discovery of the packets, coupled with other information already within the officers' knowledge, gave rise to probable cause to arrest the suspects. The Court then found that the seizure of the packets was incident to the lawful arrest and should not have been suppressed as evidence.
If an officer has lawfully detained a person based upon reasonable cause, and sees direct evidence of a crime in plain view, based on that evidence, he has probable cause for arrest and may seize the evidence in plain view.
In the instant case, the search of defendants' vehicle was not conducted until after the narcotics officer arrived and again advised the defendants of their rights, and obtained a written consent to search the vehicle from Beasley, the vehicle owner. Pursuant to this consent search, additional marijuana and cocaine were discovered.
Therefore, the evidence in this case was lawfully obtained by the police officers and appellants' assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2
Appellant Beasley contends that his sentence was excessive. Under the Louisiana Constitution of 1974, Article 1, § 20, excessive sentences are prohibited. An excessive sentence has been defined by the courts to be a sentence grossly out of proportion to the severity of the crime. State v. Bonanno, 384 So.2d 355 (La.1980).
In the instant case, the defendant entered into a plea bargain agreement wherein he pled guilty to the charge of possession of cocaine. The charge of possession of marijuana was dismissed pursuant to the agreement. When a defendant has entered into a plea bargain agreement, he is precluded from challenging the sentence for excessiveness. State v. Bell, 412 *1279 So.2d 1335 (La.1982); State v. Gray, 404 So.2d 1215 (La.1981).[5]
In any event, because of the seriousness of the offense, we cannot say that the sentence in the instant case is grossly out of proportion to the severity of the crime of possession of cocaine. The sentence is well within the statutory limits of La.R.S. 40:967.
Therefore, we find the defendant's assignment of error lacks merit.
For the above and foregoing reasons, the judgments of the trial court are affirmed.
AFFIRMED.
NOTES
[1] It is not clear from the record as to what happened to the charge of possession of marijuana. We can only surmise that it was dropped in the plea bargain agreement. In any event, the disposition of this charge is not on appeal.
[2] La.C.Cr.P. art. 215.1 provides as follows:

Art. 215.1. Temporary questioning of persons in public places; frisk for weapons
"A. A law enforcement officer may stop a person in a public place whom he reasonable believes is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably believes that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably believes the person possesses a dangerous weapon, he may search the person.
C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."
[3] We are not convinced that a driveway leading into a field constitutes a public place, but it is unnecessary to address this point since the statute is inapplicable for other reasons.
[4] In Coolidge v. New Hampshire, supra, the requirements of plain view are as follows:

"1. There must be a prior justification for an intrusion into a protected area;
2. In the course of which evidence is discovered inadvertently; and
3. Where it is immediately apparent without close inspection that the items or evidence are contraband."
[5] We are aware of the recent case of State v. Jett, 419 So.2d 844 (La.1982), wherein the Supreme Court did not overrule State v. Gray, supra, but did state that it "concluded that our review of possible constitutional error is not absolutely precluded by a defendant's agreement to plead guilty or to receive a particular sentence."